1
2
3
4
5
6
7

O

8          UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10
11
12   TAD A. STRANGE,                    )    Case No. EDCV 15-843-KK
13              Plaintiff,              )
                                        )
14        v.                            )    MEMORANDUM & ORDER
                                        )
15   CAROLYN W. COLVIN, Acting          )
     Commissioner of Social Security,   )
16                                      )
17              Defendant.              )
     _____)

18

19        Plaintiff Tad A. Strange ("Plaintiff") seeks review of the final decision of the

20   Commissioner of the Social Security Administration ("Commissioner" or "Agency")

21   denying his applications for Title II Disability Insurance Benefits ("DIB") and Title XVI

22   Supplemental Security Income ("SSI"). The parties have consented to the jurisdiction of

23   the undersigned United States Magistrate Judge, pursuant to Title 28 of the United States

24   Code, section 636(c). For the reasons stated below, the Commissioner's decision is

25   REVERSED and this action is REMANDED for further proceedings consistent with this

26   Order.

27   ///

28   ///

1

# I.

## PROCEDURAL HISTORY

On January 31, 2012, Plaintiff filed applications for DIB and SSI, alleging a disability onset date of December 1, 2011. Administrative Record ("AR") at 178. Plaintiff's applications were denied initially on October 3, 2012, and upon reconsideration on March 5, 2013. Id. at 109, 116.

On April 4, 2013, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). See id. at 35, 126. On October 11, 2013, ALJ Mark B. Greenberg held a hearing at which Plaintiff appeared with counsel and testified. Id. at 46. A vocational expert ("VE") also testified at the hearing. Id.

On November 6, 2013[1], the ALJ issued a decision denying Plaintiff's applications for DIB and SSI. Id. at 43. On January 17, 2014, Plaintiff filed a request for the Agency's Appeals Council to review the ALJ's decision. Id. at 31. On March 9, 2015, the Appeals Council denied Plaintiff's request for review. Id. at 1.

On April 29, 2015, Plaintiff filed the instant action. Dkt. 1. This matter is before the Court on the parties' Joint Stipulation ("JS"), filed January 7, 2016, which the Court has taken under submission without oral argument. Dkt. 16.

# II.

## BACKGROUND

Plaintiff was born on June 16, 1960, and his alleged disability onset date is December 1, 2011. AR at 178, 197. He was fifty-one years old on the alleged disability onset date and fifty-three years old at the time of the hearing before the ALJ. Id.

---

[1]     The Court accepts this date because the ALJ dated his Notice of Decision and decision November 6, 2013. AR at 32, 43. However, the Court notes the record contains documents in which Plaintiff asserts November 25, 2013 as the decision date. Id. at 9-10; see also ECF Docket No. ("Dkt.") 16, Joint Stipulation at 2. The parties do not raise the date of the ALJ's decision and the issue is not relevant to the claim presented. Dkt. 16. Thus, the Court declines to address it.

1   Plaintiff has a twelfth grade education, and prior work history as a prefabrication

2   manager, tool and equipment manager, electrician, foreman, leadman, and owner and

3   operator of a retail sporting goods store.  Id. at 202-03, 219.  Plaintiff alleges disability

4   based on neck pain, lower back pain, arthritis in his hips, chest pain, migraines, leg pain,

5   and heart problems.  Id. at 201.

6                                           **III.**

7                      **STANDARD FOR EVALUATING DISABILITY**

8        To qualify for DIB or SSI, a claimant must demonstrate a medically determinable

9   physical or mental impairment that prevents him from engaging in substantial gainful

10  activity, and that is expected to result in death or to last for a continuous period of at least

11  twelve months.  Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998).  The impairment

12  must render the claimant incapable of performing the work he previously performed and

13  incapable of performing any other substantial gainful employment that exists in the

14  national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).

15       To decide if a claimant is disabled, and therefore entitled to benefits, an ALJ

16  conducts a five-step inquiry.  20 C.F.R. §§ 404.1520, 416.920.  The steps are:

17       (1)    Is the claimant presently engaged in substantial gainful activity?  If so, the

18              claimant is found not disabled.  If not, proceed to step two.

19       (2)    Is the claimant's impairment severe?  If not, the claimant is found not

20              disabled.  If so, proceed to step three.

21       (3)    Does the claimant's impairment meet or equal one of the specific

22              impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so,

23              the claimant is found disabled.  If not, proceed to step four.[2]

24

25  [2]      "Between steps three and four, the ALJ must, as an intermediate step, assess the

26  claimant's [residual functional capacity]."  Bray v. Comm'r of Soc. Sec. Admin., 554

27  F.3d 1219, 1222-23 (9th Cir. 2009) (citing 20 C.F.R. § 416.920(e)).  In determining a

    claimant's residual functional capacity, an ALJ must consider all relevant evidence in the

28  record.  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).

                                              3

(4)    Is the claimant capable of performing work he has done in the past?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)    Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001); 20 C.F.R. §§ 404.1520(b)-(g)(1), 416.920(b)-(g)(1).

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five.  Bustamante, 262 F.3d at 953-54. Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry.  Id. at 954.  If, at step four, the claimant meets his burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity ("RFC"), age, education, and work experience.  Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).

## IV.

## THE ALJ'S DECISION

### A.    STEP ONE

At step one, the ALJ found Plaintiff "has not engaged in substantial gainful activity since December 1, 2011, the alleged onset date" of disability.  AR at 37 (citations omitted).

### B.    STEP TWO

At step two, the ALJ found Plaintiff had the "following severe impairments: degenerative disc disease; degenerative joint disease; obesity; coronary artery disease; hypertension; and headaches."  Id. (citations omitted).

### C.    STEP THREE

At step three, the ALJ found Plaintiff "d[id] not have an impairment or combination of impairments that meets or medically equals the severity of one of the

4

1  listed impairments in 20 CFR Part 404, Subpart R, Appendix 1." Id. at 38 (citations

2  omitted).

3  **D.    RFC DETERMINATION**

4        The ALJ found Plaintiff had the following RFC:

5        to perform light work as defined in 20 CFR 404.1567(b) except the claimant

6        is limited to occasional postural activities; he cannot climb ladders, ropes or

7        scaffolds; he must avoid concentrated exposure to cold, vibrations or

8        hazards.

9  Id.

10 **E.    STEP FOUR**

11        At step four, the ALJ found Plaintiff was "capable of performing past relevant

12 work as a manager.  This work does not require the performance of work-related

13 activities precluded by [Plaintiff]'s residual functional capacity."  Id. at 41 (citations

14 omitted).  Accordingly, the ALJ found Plaintiff "has not been under a disability, as

15 defined in the Social Security Act, from December 1, 2011" and ended his analysis.  Id.

16 at 43.

17                              **V.**

18                    **PLAINTIFF'S CLAIM**

19        Plaintiff presents one disputed issue: whether the ALJ properly considered

20 Plaintiff's subjective symptom testimony.  JS at 4.

21                              **VI.**

22                    **STANDARD OF REVIEW**

23        Pursuant to Title 42 of the United States Code, section 405(g), a district court may

24 review the Commissioner's decision to deny benefits.  The ALJ's findings and decision

25 should be upheld if they are free of legal error and supported by substantial evidence

26 based on the record as a whole.  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420,

27 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).

28        "Substantial evidence" is evidence that a reasonable person might accept as

                                5

1   adequate to support a conclusion.  Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir.

2   2007).  It is more than a scintilla but less than a preponderance.  Id.  To determine

3   whether substantial evidence supports a finding, the reviewing court "must review the

4   administrative record as a whole, weighing both the evidence that supports and the

5   evidence that detracts from the Commissioner's conclusion."  Reddick, 157 F.3d at 720;

6   see also Hill v. Astrue, 698 F.3d 1153, 1159 (9th Cir. 2012) (stating a reviewing court

7   "may not affirm simply by isolating a specific quantum of supporting evidence" (citations

8   and internal quotation marks omitted)).  "If the evidence can reasonably support either

9   affirming or reversing," the reviewing court "may not substitute its judgment" for that of

10  the Commissioner.  Reddick, 157 F.3d at 720-21; see also Molina v. Astrue, 674 F.3d

11  1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one

12  rational interpretation, we must uphold the ALJ's findings if they are supported by

13  inferences reasonably drawn from the record.").

14          The Court may review only the reasons stated by the ALJ in her decision "and may

15  not affirm the ALJ on a ground upon which he did not rely."  Orn v. Astrue, 495 F.3d

16  625, 630 (9th Cir. 2007).  If the ALJ erred, the error may only be considered harmless if

17  it is "clear from the record" that the error was "inconsequential to the ultimate

18  nondisability determination."  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir.

19  2006) (citation and internal quotation marks omitted).

**VII.**

**RELEVANT FACTS**

**A.   PLAINTIFF'S MEDICAL TREATMENT**

23          Plaintiff received medical treatment from March 23, 2011 to April 18, 2014.  On

24  March 23, 2011, Medical Doctor, Doctor of Philosophy, and Fellow of American College

25  of Surgeons Clifford C. Douglas examined Plaintiff, noting despite having heart surgery,

26  Plaintiff had coronary artery disease" and "significant back pain."  AR at 291.

27          On April 19, 2011, Dr. Douglas operated on Plaintiff's back.  Id. at 282.  Dr.

28  Douglas gave Plaintiff preoperative and postoperative diagnoses of lumbosacral

6

1  spendylosis with foraminal stenosis and intractable low back pain with radioculopathy
2  Id.

3      On July 18, 2011, Dr. Douglas examined Plaintiff.  Id. at 290.  Dr. Douglas stated
4  Plaintiff "complain[ed] of continued groin and back pain unchanged from
5  preoperatively."  Id.  Dr. Douglas further stated Plaintiff had "persistent achy pain, which
6  ke[pt] him awake at night."  Id.

7      On September 12, 2011, Dr. Douglas again examined Plaintiff.  Id. at 288.  Dr.
8  Douglas stated after Plaintiff "had two X-STOP devices placed for indirect lumbar
9  decompression and stabilization . . . [Plaintiff] continue[d] . . . to complain of lower
10 extremity pain, which is quite severe."  Id.  Dr. Douglas opined "[i]t truly d[id] appear as
11 if [Plaintiff] [wa]s suffering from a radicultis."  Id.

12     On September 27, 2011, Medical Doctor Rainier Guiang examined Plaintiff.  Id. at
13 335.  Dr. Guiang noted despite "multiple injections and cervical Radiofrequency ablation
14 procedures done over the last 15 years," Plaintiff "complain[ed] of both neck and back
15 pain."  Id.

16     On November 15, 2011, Dr. Guiang operated on Plaintiff's neck and spine.  Id. at
17 311.  Dr. Guiang noted despite neck and lumbar surgery, Plaintiff "continue[d] to have
18 neck pain."  Id.

19     On December 6, 2011, Dr. Guiang examined Plaintiff and noted Plaintiff
20 "complain[ed] of both back and neck pain."  Id. at 339.  Dr. Guiang also noted Plaintiff:
21 (1) did not feel "any significant difference after surgery"; (2) described his "pain as dull,
22 aching, burning, cramping, tingling, pins and needles, and shooting"; and (3) had back
23 and leg pain that was "continuous and rated as 8/10 in severity."  Id.  Dr. Guiang further
24 opined epidural injections afforded Plaintiff "excellent however temporary relief," but
25 Dr. Guiang "d[id] not think further injections would help."  Id.

26     On April 12, 2012, Dr. Guiang again examined Plaintiff.  Id. at 341.  Dr. Guiang
27 noted Plaintiff "complain[ed] of both neck and back pain," and prior epidural injections
28 "gave short term relief."  Id.

7

On September 24, 2012, Doctor of Osteopathic Medicine Vicente R. Bernabe performed an Orthopaedic Consultation of Plaintiff. Id. at 428-33. Dr. Bernabe noted Plaintiff "continue[d] to have pain" in his neck. Id. at 429. Dr. Bernabe stated Plaintiff's medications included: Diovan, Plavix, Hydrochlorothiazide, Aspirin, Ranexa, Simvastatin, Fenofibrate, Metroprolol, Amlodipine, Hydrocodone, and Gabapentin. Id. In addition, Dr. Bernabe diagnosed Plaintiff with degenerative disc disease of the lumbar spine, status post anterior cervical discectomy and fusion, status post lumbar discectomy and disc replacement, and cervical and lumbar musculoligamentous strain. Id. at 432.

On October 31, 2012, Doctor of Osteopathic Medicine Harold Jackson examined Plaintiff. Id. at 531. Dr. Jackson noted Plaintiff "used to get bad migraines" for which he took Topamax. Id. Dr. Jackson also noted Plaintiff previously had two epidurals, which "helped maybe 30%." Id.

On February 6, 2013, Dr. Douglas examined Plaintiff. Id. at 504. Dr. Douglas noted Plaintiff's pain was not "a radicular pain, but rather an axial pain associated with the neck . . . [which] [s]ometimes result[ed] in headaches where [Plaintiff] felt like he [wa]s having a worsening in his migraines." Id. at 504.

On April 18, 2014, Dr. Jackson completed a Physical Residual Functional Capacity Questionnaire. Id. at 582. Dr. Jackson identified as Plaintiff's primary care physician and stated he treated Plaintiff monthly since January 6, 2011. Id. Dr. Jackson diagnosed Plaintiff with osteoarthritis, spine disease, and chronic pain syndrome with a prognosis of "[p]oor for improvement" and symptoms of back, hip, and neck pain. Id. at 582. Dr. Jackson noted Plaintiff's treatment included "pain medication, epidural (failed)" and Plaintiff's "pain or other symptoms [were] severe enough to interfere with attention and concentration . . . [c]onstantly." Id. at 582-83. Dr. Jackson further noted Plaintiff: (1) had "significant limitations in doing repetitive reaching, handling or fingering"; (2) could not reach his arms overhead; and (3) would be absent from work "[m]ore than three time[s] a month" because of his impairment or treatment. Id. at 585-86.

**B.    PLAINTIFF'S TESTIMONY**

8

1    At the hearing on October 11, 2013, Plaintiff testified about his pain, treatment,
2    daily activities, and restrictions.  Id. at 50-63.  With respect to pain, Plaintiff testified in
3    December 2011, he "developed some serious back problems" causing "pains down [his]
4    legs [and] nerve pains in [his] legs."  Id. at 50.  Plaintiff testified he felt pain in both of
5    his legs "[c]onstantly" and "anything . . . cause[d] it," including lying in bed, sitting,
6    lifting, and bending.  Id.  Plaintiff testified he had migraine headaches "[o]nce or twice a
7    month" for five to six hours, during which he constantly vomited.  Id. at 62-63.

8    With respect to treatment, Plaintiff testified he has "done epidurals, nerve blocks,
9    nerve ablations and [was] taking medications and [was] up to oxycodone."  Id. at 51.
10   Plaintiff testified he had "a dozen nerve ablations in [his] neck."  Id. at 60.  Plaintiff
11   further testified he took pain medications daily, which caused "[l]oopiness and
12   sleepiness."  Id. at 51.  Plaintiff also testified: "maintaining a focus is a big problem I
13   have with the drugs I take."  Id. at 52.

14   With respect to daily activities, Plaintiff testified: "I don't do much actually."  Id.
15   at 51.  Plaintiff testified: "When I wash my hair in the shower, I cannot complete it
16   without having to put my arms down and rest."  Id. at 52.  Plaintiff testified he did "some
17   laundry" and rinsed dishes to put in a dishwasher, but could not do any other household
18   chores.  Id.  Plaintiff also testified he abstained from "too much" yard work, his wife did
19   most yard work, and "a part time gardener . . . d[id] the heavy stuff."  Id. at 53.  Plaintiff
20   further testified he had two sixty-pound dogs, which he took on separate walks daily for
21   fifteen minutes each, and watched the dogs play in his backyard.  Id. at 52, 54.  In
22   addition, Plaintiff testified his wife grocery shopped while he "just lean[ed] against the
23   cart and [went] with her."  Id. at 53.  Plaintiff testified he visited swap meets "probably
24   twice a month" and he "usually stay[ed] around 45 minutes" each time.  Id. at 59.

25   With respect to restrictions, Plaintiff testified he could neither lift more than twenty
26   pounds nor lift repetitively.  Id. at 51-52.  Plaintiff testified a doctor suggested he walk
27   with a cane and when he walked outdoors he used a cane "[m]ost of the time."  Id. at 61.
28   In addition, Plaintiff testified he could only sit for about fifteen to twenty minutes at a

1   time.  Id. at 55.

2        Plaintiff testified on "a typical good day" he showered, walked around a swap meet

3   for forty-five minutes, rested at home, and ingested oxycodone.  Id. at 58.  Plaintiff also

4   testified he had "bad days" three days a week and "on a bad day . . . [he] just stay[ed] in

5   [his] pajamas and ha[d] a cup of coffee and [went] back to bed."  Id. at 57; see also id. at

6   59.

7   **C.    VOCATIONAL EXPERT'S TESTIMONY**

8        The ALJ presented three hypothetical individuals to the VE.  Id. at 67-75.  The first

9   hypothetical individual could perform "light work; occasional postural activities; no

10  climbing of ladders, ropes, or scaffolds; no concentrated exposure to extreme cold,

11  vibration or hazards."  Id. at 67.  The ALJ asked whether the individual could perform

12  Plaintiff's past work and the VE stated the individual could work as a store manager "but

13  only per the DOT code, not as performed."  Id.  The ALJ asked "what about the

14  owner/operator" job and the VE answered the individual "would be able to do the

15  owner/operator and the prefabrication manager."  Id.  The ALJ asked "if for some reason,

16  based on that hypo the individual couldn't do past work, would other work fit that hypo?"

17  Id.  The VE answered the individual could work as a store manager, packer, housekeeper,

18  and bench assembler.  Id. at 67-68.

19       The second hypothetical individual could perform "no overhead reaching; frequent

20  reaching in other directions."  Id. at 68.  The ALJ asked whether "past work remain[ed]

21  available" and the VE answered "[b]oth managers of stores would be available.  Both

22  manager occupations, the manager, industrial organization, and the store manager."  Id.

23            The third hypothetical individual had the following limitations:

24            lifting and carrying and pushing or pulling is limited to 10 pounds; standing

25            or walking limited to 45 minutes at one time for no more than three hours

26            total in an eight hour workday; sitting limited to 30 minutes at one [time];

27            use of a cane for prolonged ambulation over 45 minutes at one time; with no

28            balancing, no hazards, and no uneven terrain.

                                             10

1  <u>Id.</u> at 68-69.  The ALJ asked if the individual could perform Plaintiff's past work and the

2  VE answered "I don't believe he could perform past relevant work."  <u>Id.</u> at 69.  The ALJ

3  asked if the individual had "the stand/walk limited of three and the lift, carry, push, pull

4  limit of 10, what kind of light work would there be?"  <u>Id.</u> at 70.  The VE answered the

5  individual could work as a billing clerk and appointment clerk.  <u>Id.</u> at 71.

6        In addition, Plaintiff's counsel asked the VE to consider: "If we were to take any of

7  these hypotheticals and hypotheticals one, two, and three and add off task due to the

8  effects of medication . . . 20 percent."  <u>Id.</u> at 75.  The VE stated: "Then in that instance

9  they would not be able to perform competitive employment."  <u>Id.</u>  Plaintiff's counsel then

10  asked if an individual could perform work with limitations "the same [as stated in prior]

11  hypotheticals, but instead of stating it off task 20 percent of the time, missing work more

12  than two days a month because of the pain or effects of medication."  <u>Id.</u>  The VE

13  answered the individual "would not be able to sustain competitive employment."  <u>Id.</u>

14  **D.   ALJ'S ADVERSE CREDIBILITY FINDING**

15        In the decision dated November 6, 2013, the ALJ found Plaintiff's "medically

16  determinable impairments could reasonably be expected to cause the alleged symptoms;

17  however, [Plaintiff]'s statements concerning the intensity, persistence and limiting effects

18  of these symptoms are not entirely credible."  <u>Id.</u> at 39.  In support of this finding, the

19  ALJ cited: (1) purported improvements in Plaintiff's conditions; (2) Plaintiff's alleged

20  conservative treatment; (3) purported mild to moderate medical findings; and (4) an

21  alleged lack of prescribed restrictions.  <u>Id.</u> at 39-41.

22  **VIII.**

23  **DISCUSSION**

24        If "the record establishes the existence of a medically determinable impairment that

25  could reasonably give rise to the reported symptoms, an ALJ must make a finding as to

26  the credibility of the claimant's statements about the symptoms and their functional

27  effect."  <u>Robbins</u>, 466 F.3d at 883 (citations omitted).  The ALJ's credibility

28  determination must be supported by "findings sufficiently specific to permit the court to

11

conclude that the ALJ did not arbitrarily discredit claimant's testimony." Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (citation and internal quotation marks omitted).

The ALJ is required to engage in a two-step analysis. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." Molina, 674 F.3d at 1112 (citations and internal quotation marks omitted). "If the claimant has presented such evidence, and there is no evidence of malingering, then the ALJ must give specific, clear and convincing reasons in order to reject the claimant's testimony about the severity of the symptoms." Id. (citations and internal quotation marks omitted). "The ALJ must state specifically which symptom testimony is not credible and what facts in the record lead to that conclusion." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996); see also Brown-Hunter v. Colvin, 806 F.3d 487, 489 (9th Cir. 2015) (holding "an ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination").

"If the ALJ's credibility finding is supported by substantial evidence, [a court] may not engage in second-guessing." Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002). However, an ALJ's failure to give specific, clear, and convincing reasons to reject the claimant's testimony about the severity of the symptoms is not harmless, because it precludes the Court from conducting a meaningful review of the ALJ's reasoning. Brown-Hunter, 806 F.3d at 489.

## A.    THE ALJ IGNORED THE OVERALL DIAGNOSTIC RECORD

The ALJ found Plaintiff less than credible based upon: (1) purported improvements in Plaintiff's conditions; (2) Plaintiff's alleged conservative treatment; (3) purported mild to moderate medical findings; and (4) an alleged lack of prescribed restrictions. AR at 39-41. However, an ALJ must view a claimant's treatment records "in light of the overall diagnostic record," including where the records "consistently reveal that, despite some

1   occasional signs of improvement" the claimant continued to suffer from symptoms.

2   Ghanim v. Colvin, 763 F.3d 1154, 1164 (9th Cir. 2013).  In addition, the ALJ "has an

3   independent duty to fully and fairly develop the record and to assure that the claimant's

4   interests are considered. . . . Ambiguous evidence, or the ALJ's own finding that the

5   record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's

6   duty to conduct an appropriate inquiry."  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th

7   Cir. 2001) (internal citations and quotation marks omitted).

8          **(1)    The ALJ erroneously relied on purported improvements in Plaintiff's**

9                  **conditions**

10         Here, the overall diagnostic record demonstrates the ALJ erroneously relied on

11  purported improvements in Plaintiff's conditions.  See Ghanim, 763 F.3d at 1164.  First,

12  the ALJ stated Plaintiff testified his migraines were "being managed effectively with a

13  new medication."  AR at 39.  However, Plaintiff testified medication helped his

14  migraines, but he still had migraines "[o]nce or twice a month" for five to six hours,

15  during which he constantly vomited.  Id. at 62-63.  Thus, the overall diagnostic record

16  fails to demonstrate medication effectively managed Plaintiff's migraines.  See Ghanim,

17  763 F.3d at 1164.

18         Second, the ALJ stated Plaintiff had "undergone a series of neck and hip epidural

19  injections with adequate but temporary relief."  AR at 39.  However, temporary relief is

20  not a valid reason to find Plaintiff less than credible, especially in light of the following

21  medical records:

22         •      On September 27, 2011, Dr. Guiang noted despite "multiple injections and

23                cervical Radiofrequency ablation procedures done over the last 15 years,"

24                Plaintiff "complain[ed] of both neck and back pain."  Id. at 335.

25         •      On November 15, 2011, Dr. Guiang noted despite neck and lumbar surgery,

26                Plaintiff "continue[d] to have neck pain."  Id. at 311.

27         •      On December 6, 2011, Dr. Guiang noted Plaintiff again "complain[ed] of

28                both back and neck pain."  Id. at 339.  Dr. Guiang also noted Plaintiff: (1)

13

did not feel "any significant difference after surgery"; (2) described his "pain as dull, aching, burning, cramping, tingling, pins and needles, and shooting"; and (3) had back and leg pain that was "continuous and rated as 8/10 in severity." <u>Id.</u> Dr. Guiang further stated he "d[id] not think further injections would help." <u>Id.</u>

• On April 12, 2012, Dr. Guiang noted Plaintiff "complain[ed] of both neck and back pain," and prior epidural injections only "gave short term relief." <u>Id.</u> at 341.

Thus, the overall diagnostic record demonstrates surgeries and epidurals failed to adequately address Plaintiff's reoccurring pain. <u>See</u> <u>Ghanim</u>, 763 F.3d at 1164.

Third, the ALJ stated Plaintiff "denied pain, numbness or weakness in the upper extremities" at a February 6, 2013 physical examination. AR at 40. However, in the notes documenting that examination, Dr. Douglas stated Plaintiff's pain was "an axial pain associated with the neck . . . [which] [s]ometimes result[ed] in headaches where [Plaintiff] felt like he [wa]s having a worsening in his migraines." <u>Id.</u> at 504. Additionally, in notes dated April 18, 2014, Dr. Jackson stated Plaintiff had "significant limitations in doing repetitive reaching, handling or fingering," could not reach his arms overhead, and would be absent from work "[m]ore than three time[s] a month" because of his impairment or treatment. <u>Id.</u> at 585-86. Thus, the overall diagnostic record demonstrates axial pain and limitations in Plaintiff's upper extremities persisted. <u>See</u> <u>Ghanim</u>, 763 F.3d at 1164.

Therefore, the ALJ ignored evidence in the overall diagnostic record establishing Plaintiff's reoccurring pain and limitations. <u>See id.</u> To the extent the ALJ found purported improvements in Plaintiff's conditions ambiguous, the ALJ failed his duty to conduct an appropriate inquiry. <u>See</u> <u>Tonapetyan</u>, 242 F.3d at 1150.

///

**(2)    The ALJ erroneously described Plaintiff's treatment as**

14

1                                 **conservative treatment**

2         The overall diagnostic record shows the ALJ erroneously described Plaintiff's

3 treatment as conservative treatment. <u>See</u> <u>Ghanim</u>, 763 F.3d at 1164. First, the ALJ stated

4 Plaintiff "confirmed that the only treatment he [wa]s receiving [wa]s physical therapy and

5 pain medication" for his back and neck pain. AR at 39. However, on April 19, 2011, Dr.

6 Douglas operated on Plaintiff's back. <u>Id.</u> at 282. In addition, Plaintiff stated he has had

7 "a dozen nerve ablations in [his] neck." <u>Id.</u> at 60. Further, on September 24, 2012, Dr.

8 Bernabe stated Plaintiff's prescribed pain medications included narcotics Hydrocodone

9 and Gabapentin. <u>Id.</u> at 429. The ALJ himself acknowledged Plaintiff had "undergone a

10 series of neck . . . epidural injections." <u>Id.</u> at 39. Thus, the overall diagnostic record

11 demonstrates treatment for Plaintiff's back and neck exceeded physical therapy and pain

12 medication. <u>See</u> <u>Ghanim</u>, 763 F.3d at 1164.

13         Second, the ALJ stated Plaintiff "noted ongoing relief with cervical ablation and

14 continued pain medications." AR at 40. However, on September 27, 2011, Dr. Guiang

15 noted despite "multiple injections and cervical Radiofrequency ablation procedures done

16 over the last 15 years," Plaintiff "complain[ed] of both neck and back pain." <u>Id.</u> at 335.

17 Thus, the overall diagnostic record fails to demonstrate Plaintiff had ongoing relief, or

18 Plaintiff's cervical ablations and pain medications constitute conservative treatment. <u>See</u>

19 <u>Ghanim</u>, 763 F.3d at 1164.

20         Third, the ALJ stated "there is no indication that an assistive advice was prescribed

21 or medically necessary . . . [Plaintiff] remained on non-surgical management of his pain

22 symptoms." AR at 40. However, Plaintiff stated a doctor suggested he walk with a cane

23 and he walked outdoors with a cane "[m]ost of the time." <u>Id.</u> at 61. In addition, on April

24 19, 2011, Dr. Douglas operated on Plaintiff's back, which produced unchanged

25 diagnoses. <u>Id.</u> at 282. Further, on July 18, 2011, Dr. Douglas stated Plaintiff had

26 "persistent achy pain, which ke[pt] him awake at night." <u>Id.</u> at 290. Moreover, on

27 November 15, 2011, Dr. Guiang operated on Plaintiff's neck and spine, which produced

28 unchanged pain levels. <u>Id.</u> at 311. Thus, the overall diagnostic record does not support

1    the ALJ's statement that the record made "no indication an assistive advice was

2    prescribed or medically necessary," or Plaintiff "remained on non-surgical management

3    of his pain symptoms."  See id. at 40; Ghanim, 763 F.3d at 1164.

4        Fourth, the ALJ stated Plaintiff's "symptoms were neuropathic in nature and

5    surgical intervention was not required."  AR at 40.  However, Plaintiff's doctors

6    frequently noted unsuccessful surgical attempts to control Plaintiff's pain, such as on July

7    18, 2011, when Dr. Douglas stated Plaintiff "complain[ed] of continued groin and back

8    pain unchanged from preoperatively."  Id. at 290.  Thus, the overall diagnostic record

9    fails to demonstrate surgical intervention would have addressed Plaintiff's symptoms or a

10   lack of required surgical intervention undermines Plaintiff's credibility.  See Ghanim,

11   763 F.3d at 1164.

12       Fifth, the ALJ stated with respect to Plaintiff's musculoskeletal conditions,

13   "objective medical records indicate that [Plaintiff] has been treated for the conditions in a

14   conservative manner."  AR at 41.  However, medical records demonstrate doctors have

15   treated Plaintiff for his musculoskeletal conditions with surgery and narcotics as follows:

16       •    On April 19, 2011, Dr. Douglas operated on Plaintiff's back.  Id. at 282.

17       •    On September 12, 2011, Dr. Douglas stated Plaintiff "had two X-STOP

18            devices placed for indirect lumbar decompression and stabilization."  Id. at

19            288.

20       •    On September 27, 2011, Dr. Guiang noted Plaintiff had "multiple injections

21            and cervical Radiofrequency ablation procedures done over the last 15

22            years."  Id. at 335.

23       •    On November 15, 2011, Dr. Guiang operated on Plaintiff's neck and spine.

24            Id. at 311.

25       •    On September 24, 2012, Dr. Bernabe stated Plaintiff's medications included

26            Hydrocodone and Gabapentin.  Id. at 429.

27   Thus, the overall diagnostic record fails to demonstrate conservative treatment for

28   Plaintiff's musculoskeletal conditions.  See Ghanim, 763 F.3d at 1164.

16

1    Sixth, the ALJ stated Plaintiff "has been routinely management [sic] for

2    hypertension with antihypertensive medication and he has not been hospitalized for acute

3    chest pains and other cardiac symptoms." AR at 40. However, on March 23, 2011, Dr.

4    Douglas noted that after Plaintiff had surgery to address his heart problems, Plaintiff still

5    "ha[d] coronary artery disease." Id. at 291. In addition, on September 24, 2012, Dr.

6    Bernabe noted Plaintiff's medications included Diovan, Plavix, Hydrochlorothiazide,

7    Aspirin, Ranexa, Simvastatin, Fenofibrate, Metroprolol, and Amlodipine. Id. at 429.

8    Thus, the overall diagnostic record fails to demonstrate routine or conservative

9    management of Plaintiff's hypertension. See Ghanim, 763 F.3d at 1164.

10   Therefore, the ALJ ignored evidence in the overall diagnostic record demonstrating

11   Plaintiff's treatment exceeded conservative treatment. See id. To the extent the ALJ

12   found the aggressiveness of Plaintiff's treatment ambiguous, the ALJ failed his duty to

13   conduct an appropriate inquiry. See Tonapetyan, 242 F.3d at 1150.

14   **(3)   The ALJ erroneously described Plaintiff's medical findings as mild to**

15   **moderate**

16   The overall diagnostic record demonstrates the ALJ erroneously described

17   Plaintiff's medical findings as mild to moderate. See Ghanim, 763 F.3d at 1164. First,

18   the ALJ stated in "April and May of 2012 . . . [Plaintiff] noted a mild to moderate level of

19   pain and ambulated with an antalgic gait during these visits." AR at 39. However, on

20   December 6, 2011, Dr. Guiang noted Plaintiff had back and leg pain that was

21   "continuous and rated as 8/10 in severity." Id. at 339. In addition, on April 18, 2014, Dr.

22   Jackson diagnosed Plaintiff with osteoarthritis, spine disease, and chronic pain syndrome

23   with a prognosis of "[p]oor for improvement" and symptoms of back, hip, and neck pain.

24   Id. at 582. Thus, the overall diagnostic record demonstrates the severity of Plaintiff's

25   pain exceeded mild to moderate. See Ghanim, 763 F.3d at 1164.

26   Second, the ALJ noted Dr. Bernabe's examination showed Plaintiff had only minor

27   limitations and Dr. Bernabe concluded Plaintiff "could perform a range of light work

28   with occasional postural and agility activities." AR at 40. However, Dr. Bernabe's

17

September 24, 2012 notes state Plaintiff "continue[d] to have pain" in his neck. Id. at 429. Dr. Bernabe also diagnosed Plaintiff with degenerative disc disease of the lumbar spine, status post anterior cervical discectomy and fusion, status post lumbar discectomy and disc replacement, and cervical and lumbar musculoligamentous strain. Id. at 432. In addition, on April 18, 2014, Dr. Jackson stated Plaintiff's "pain or other symptoms [were] severe enough to interfere with attention and concentration . . . [c]onstantly." Id. at 582-83. Dr. Jackson further noted Plaintiff: (1) had "significant limitations in doing repetitive reaching, handling or fingering"; (2) could not reach his arms overhead; and (3) would be absent from work "[m]ore than three time[s] a month" because of his impairment or treatment. Id. at 585-86. Thus, the overall diagnostic record fails to demonstrate Plaintiff's limitations were minor. See Ghanim, 763 F.3d at 1164.

Third, the ALJ noted "[a] bone scan failed to show evidence of psuedoarthrosis or significant inflammatory spine disease." AR at 40. In addition, the ALJ stated "X-ray imaging of the lumbar spine showed that the stabilization objects were in proper position and there was moderate facet of arthropathy at L5-S1." Id. The ALJ further stated "[t]he record does not show deficits in upper extremities." Id. at 41. However, the following medical records showed significant instability and deficits:

- On April 19, 2011, Dr. Douglas noted Plaintiff's preoperative and postoperative diagnoses as lumbosacral spendylosis with foraminal stenosis and intractable low back pain with radiculopathy Id. at 282.

- On April 12, 2012, Dr. Guiang noted Plaintiff "complain[ed] of both neck and back pain," and prior epidural injections only "gave short term relief." Id. at 341.

- On April 18, 2014, Dr. Jackson diagnosed Plaintiff with osteoarthritis, spine disease, and chronic pain syndrome with a prognosis of "[p]oor for improvement" and symptoms of back, hip, and neck pain. Id. at 582. Dr. Jackson noted Plaintiff's treatment included "pain medication, epidural (failed)" and Plaintiff's "pain or other symptoms [were] severe enough to

interfere with attention and concentration . . . [c]onstantly." Id. at 582-83. Dr. Jackson further noted Plaintiff had "significant limitations in doing repetitive reaching, handling or fingering," could not reach his arms overhead, and would be absent from work "[m]ore than three time[s] a month" because of his impairment or treatment. Id. at 585-86.

Thus, the overall diagnostic record demonstrates instability and deficits in Plaintiff's back and upper extremities. See Ghanim, 763 F.3d at 1164.

Therefore, the ALJ ignored evidence in the overall diagnostic record demonstrating medical findings exceeded mild to moderate levels. See id. To the extent the ALJ found certain medical findings ambiguous, the ALJ failed his duty to conduct an appropriate inquiry. See Tonapetyan, 242 F.3d at 1150.

**(4)     The ALJ erroneously relied on an alleged lack of prescribed restrictions**

The overall diagnostic record shows the ALJ erroneously relied on an alleged lack of prescribed restrictions. See Ghanim, 763 F.3d at 1164. The ALJ found "a review of the record in this case reveals no restrictions recommended by the treating doctor." AR at 41. However, on April 18, 2014, Dr. Jackson identified as Plaintiff's primary care physician who treated Plaintiff monthly since January 6, 2011, and noted Plaintiff's "pain or other symptoms [were] severe enough to interfere with attention and concentration . . . [c]onstantly." Id. at 582-83. Dr. Jackson further noted Plaintiff had "significant limitations in doing repetitive reaching, handling or fingering," could not reach his arms overhead, and would be absent from work "[m]ore than three time[s] a month" because of his impairment or treatment. Id. at 585-86. Therefore, the ALJ ignored evidence in the overall diagnostic record demonstrating indications of significant restrictions by Plaintiff's treating doctor. See Ghanim, 763 F.3d at 1164. To the extent the ALJ found Dr. Jackson's failure to more expressly order restrictions ambiguous, the ALJ failed his duty to conduct an appropriate inquiry. See Tonapetyan, 242 F.3d at 1150.

Accordingly, the ALJ's reliance on any purported: (1) improvements in Plaintiff's conditions; (2) conservative treatment; (3) mild to moderate medical findings; and (4)

lack of prescribed restrictions fails to provide specific, clear, and convincing reasons for discrediting Plaintiff.  See Brown-Hunter, 806 F.3d at 489.

**B.    PLAINTIFF'S TESTIMONY SHOWS HIS DAILY ACTIVITIES ARE MORE LIMITED THAN THE ALJ IMPLIED**

The ALJ found Plaintiff "described activities of daily living that are not limited to the extent one would expect, given the complaint of disabling symptoms and limitations." AR at 39.  However, reasons for discrediting a plaintiff that misstate the record "provide[] no support for [an ALJ's] credibility finding." Lingenfelter, 504 F.3d at 1036; see White v. Colvin, No. EDCV 13-1626-PLA, 2014 WL 4187823, at *7 (C.D. Cal. Aug. 21, 2014) (reversing and remanding ALJ's decision based upon an adverse credibility finding where "plaintiff's testimony demonstrate[d] that her daily activities [we]re far more limited than the ALJ implie[d]").

Here, Plaintiff's testimony demonstrates Plaintiff's daily activities were more limited than the ALJ implied.  First, the ALJ stated Plaintiff testified "he is able to care for his dogs." AR at 39.  However, Plaintiff merely testified he took his dogs on separate walks daily for fifteen minutes each and watched the dogs play in his backyard. Id. at 52, 54. Second, the ALJ stated Plaintiff "could go to the swap meet about twice per month." Id. at 39.  However, Plaintiff testified he visited swap meets "probably twice a month" and he only "usually stay[ed] around 45 minutes" each time. Id. at 59. Third, the ALJ stated Plaintiff could "do light chores at home." Id. at 39.  However, Plaintiff testified he did "some laundry" and rinsed dishes to put in a dishwasher, but could not do any other household chores. Id. at 52. Fourth, the ALJ stated Plaintiff could "shop for groceries with his wife." Id. at 39.  However, Plaintiff testified his wife grocery shopped while he "just lean[ed] against the cart and [went] with her." Id. at 53.

Plaintiff's further testimony demonstrates his daily activities were far more limited than the ALJ implied.  See White, 2014 WL 4187823, at *7.  Examples of the limitations in Plaintiff's daily activities include:

•    Plaintiff stated he could only sit for about fifteen to twenty minutes at a time.

20

AR at 55.

• Plaintiff stated on "a typical good day" he showered, walked around a swap meet for forty-five minutes, rested at home, and ingested oxycodone. Id. at 58.

• Plaintiff stated he had "bad days" three days a week and "on a bad day . . . [he] just stay[ed] in [his] pajamas and ha[d] a cup of coffee and [went] back to bed." Id. at 57.

The ALJ thus exaggerated Plaintiff's testimony regarding his daily activities and the ALJ's misstatements "provide[] no support for [the ALJ's] credibility finding." See Lingenfelter, 504 F.3d at 1036. Therefore, the ALJ's discussion of Plaintiff's daily activities failed to provide specific, clear, and convincing reasons for discrediting Plaintiff. See Brown-Hunter, 806 F.3d at 489.

## IX.

## RELIEF

"When an ALJ's denial of benefits is not supported by the record, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." Hill, 698 F.3d at 1162 (citation and internal quotation marks omitted). "We may exercise our discretion and direct an award of benefits where no useful purpose would be served by further administrative proceedings and the record has been thoroughly developed." Id. (citation and internal quotation marks omitted). "Remand for further proceedings is appropriate where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find the claimant disabled if all the evidence were properly evaluated." Id. (citations omitted); see also Reddick, 157 F.3d at 729 ("We do not remand this case for further proceedings because it is clear from the administrative record that Claimant is entitled to benefits.").

In this case, the record has not been fully developed. The ALJ must reassess Plaintiff's limitations and their impact on the disability determination. Accordingly,

1 remand for further proceedings is appropriate.

2                                    **X.**

3                                 **ORDER**

4        For the foregoing reasons, IT IS ORDERED judgment be entered REVERSING

5 the decision of the Commissioner and REMANDING this action for further proceedings

6 consistent with this Order.  IT IS FURTHER ORDERED the Clerk of the Court serve

7 copies of this Order and the Judgment on counsel for both parties.

8

9

10 DATED: JANUARY 19, 2016    _____

11                              HONORABLE KENLY KIYA KATO
                               UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

22